[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case presents the issue of what duty the law imposes upon the owner of an enclosed shopping mall to its tenants to maintain the economic viability of the mall. The precise issue has not been decided by CT Page 10516 the appellate courts of this state.
The facts of this case are as follows: The Hartford Civic Center (hereinafter "Civic Center") located in downtown Hartford is an enclosed mall with retail stores facing inward toward a central court and generally not visible from the street. The facility also contains a coliseum used for events and exhibitions, and an arena for sporting contests. Customers are attracted to the Civic Center by the direct advertising of retailers, by promotion of the Civic Center as a downtown shopping mall, and by events at the coliseum and sports arena. Interdependency of the retailers is particularly important. Consumers coming to the Civic Center to make an intended purchase at one store, frequently make an impulse purchase at another store. On the one hand, full occupancy of the Civic Center helps all the retailers to prosper. On the other hand, low occupancy gave the Civic Center a deserted feeling that depresses the sales of the remaining retailers.
Plaintiff, De La Concha of Hartford, Inc. (hereinafter "De La Concha") was a retail distributor of tobacco and tobacco related products. The defendant, Aetna Life Insurance Company is the owner and lessor of the Civic Center. In 1995 De La Concha entered into a fifteen year lease with Aetna Life Casualty Company, predecessor to defendant Aetna for retail space in the Civic Center. The lease was renewed in 1990 and 1995, and expired by its terms in September 2000.
The lease provided for an annual rental of $6,502.00 the first year, $9,625.00 the second and third years, and $13,125.00 the fourth through the fifteenth years, plus a percentage rental of five percent of gross sales. The lease further required De La Concha to contribute $18.23 a month to a promotional fund, to which other tenants contributed amounts based on the square footage of their stores. Aetna agreed "to contribute not less than twenty five (25%) percent of the total amount of funds paid by the tenants of the Retail Complex hereunder. However landlord at its option may elect to contribute all or part of the services of a promotion director and/or secretary or to provide reasonable office space and equipment in lieu of the cash contributions."
Plaintiff's lease was amended as of January 1, 1980 to provide that the percentage rent would be five (5%) percent of gross sales in excess of $262,500.00 each year and that Aetna could terminate the lease if plaintiff's gross sales were less than $400,000.00 in one year. The lease was amended in 1990 to extend its terms to September 30, 1999 and to change the percentage rent to five (5%) percent of the gross sales, exclusive of cigarette sales, exceeding $262,500.00. It further gave plaintiff the option to extend the term of the lease for two additional five year terms provided plaintiff was not in default and its gross sales CT Page 10517 in the last year prior to the date of exercise of the option totaled at least $262,500.00. Plaintiff exercised its option to renew in March 1995 and the lease was renewed for five more years to terminate on September 30, 2000 with a slight increase in rent and a slight change in the percentage rent provision.
De La Concha's lease did not provide, as the leases of other tenants did, a clause tying Del La Concha's tenancy either to a prescribed occupancy rate of the Civic Center or to a key tenant remaining at the Civic Center.
The Civic Center opened in 1975. It was essentially fully occupied. However, Aetna was never able to find an anchor tenant. As a consequence, it created Leuttgens as an upscale department store, which, during the entire time of its existence, lost money and required subsidization by Aetna. In subsequent years the Civic Center's occupancy rate fluctuated with the Hartford economy. In the early 1980's, when the Hartford economy contracted, the occupancy rate dropped to between 50-75%; in the mid and late 1980's, when the Hartford economy rebounded, the occupancy rate rose to ninety (90%) percent. When the Hartford economy depressed again in the early 1990's the occupancy rate again started dropping. Yet, even when fully occupied Aetna lost money as the owner of the Civic Center.
For many years Aetna spent enormous amounts of its own money to make the Civic Center a viable business venture. It felt its reputation as a leading Hartford company and important Hartford citizen was at stake. From 1992 to 1998 Aetna contributed many times more to the promotional fund than it was obligated to do under the lease.
In the mid 1990's a number of factors contributed to the falling occupancy at the Civic Center and the difficulty Aetna had acquiring new tenants:
(1) A number of Hartford companies laid off downtown employees, reducing the source of customers for the Civic Center;
(2) New shopping centers expanded, upgraded or opened in the suburbs, including Westfarms Mall, West Hartford center, and Buckland Hills;
(3) The Hartford Coliseum lost out in ticket sales to the Meadows Music Theater in north Hartford;
(4) The Hartford Whalers, the biggest sports draw in Hartford, left in 1997; CT Page 10518
(5) Downtown Hartford retail establishments such as G. Fox and Sage Allen closed their doors leaving little to attract customers to downtown Hartford.
Although Aetna tried to buck the trend, its efforts at promotion did not increase traffic, obtain new tenants, or acquire tenant replacements at the Civic Center.
In 1995 David Romano became Aetna's manager for the Civic Center. When he analyzed the financial outlook he found the Civic Center had lost more than fifty million dollars in twenty years, had few substantial tenants and was hemorrhaging thousands of dollars for lack of rental income and high operating expenses. He explored the possibilities of Aetna closing the Civic Center, selling it, or finding a partner able to run it profitably. His analysis revealed that, by closing the Civic Center, Aetna would lose $4,837,750.00 in rents and still incur non-discretional operating expenses of $1,230,135.00. By keeping it open, Aetna projected annual operating losses of $534,363.00 and avoided expensive tenant lease buyouts of between four and five million dollars.
Because Mr. Romano deemed selling the Civic Center as the most likely alternative, but he could not foresee what use the potential purchaser might make of the center, he undertook a policy of entering into short term leases or ones giving Aetna the right to recapture the premises in order to make the Civic Center more saleable. That policy however seemed to have little impact on acquiring new tenants, and some of the existing tenants actually insisted on year to year leases or early termination dates before renewing. In 1995 Aetna essentially terminated its efforts to promote the Civic Center and substantially cut its promotion budget. It stopped TV, radio, and newspaper advertising and promotional events in the center court. It also stopped requiring tenants to contribute to the Civic Center marketing fund.
This lack of promotion, however had little effect on tenant sales. In fact, in fiscal year December 1998, the Civic Center retailers reported a 5.5% increase in sales and in the period from May 1998 to May 1999 a 1.5% increase in sales.
At the same time, from 1992 to 1997, the cigar industry experienced its biggest boom. In 1997 De La Concha sales peaked at $550,027.00, over 70% higher than they had been just five years earlier.
In fiscal year 1998, Aetna collected $80,470.00 in tenant contributions to the Civic Center marketing fund and spent $66,700.00 for direct advertising and promotion of the Civic Center. For fiscal year 1999, the tenants contributed $29,179.00 and Aetna spent less than $12,000.00 in CT Page 10519 direct promotion. In those years it limited its capital expenditures to safety measures and maintaining the physical integrity of the premises.
In 1997 Aetna finally decided to sell the Civic Center. However, it incurred indirect promotion expenses so it did not violate the terms of the lease. It sent out promotional material to potential buyers and notified its tenants. The first potential purchaser, the Hutensky Group was rejected by the City of Hartford. Finally in 1999 Aetna agreed to sell the Civic Center to Northland, Inc. for development into a high rise residential complex with some retail stores.
Del La Concha continued in business but the cigar boon burst in 1998. In 1999 its sales dropped from $401,120 to $283,535. It also started to default in its rent. Despite reduction in sales, in 2000, however, Del La Concha sought to exercise its option to renew its lease for another five years. Del La Concha was then behind in its rents and had failed to maintain its annual sales of at least $262,500.00, provided as conditions for renewal in the lease. Aetna rejected plaintiff's option to renew.
Del La Concha closed its doors on March 17, 2001 and shortly after started this action. In its second amended complaint it alleges five counts[1] but in its post trial brief asserts only three: (1) breach of implied covenant of good faith and fair dealing; (2) negligent misrepresentation; and (3) violation of Connecticut Unfair Trade Practices Act (CUTPA). The failure to brief the other two counts are deemed abandoned.
 I. Breach of Covenant of Good Faith and Fair Dealing
The courts have consistently applied the principle expressed in Section 205 of Restatement (Second) of Contracts, "Every contract imposes upon each party a duty of faith and fair dealing in its performance and its enforcement." Warner v. Konover, 210 Conn. 150, 154 (1989); Habetz v.Condon, 224 Conn. 231, 238 (1992). As interpreted by our courts, the principle requires that "`neither party [will] do anything that will injure the right of the other to receive the benefits of the agreement. . . .' `Essentially it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended.'" Middletown Commercial Associates Ltd.Partnership v. Middletown, 53 Conn. App. 432, cert. denied250 Conn. 919 (1999).
Plaintiff claims Aetna violated this principle by reason of the special character of the Civic Center and the special responsibility imposed on Aetna as an owner of such a shopping mall. Specifically, plaintiff emphasizes that the Civic Center is an enclosed, self contained shopping area, not facing any street, to which customers are induced to come, not CT Page 10520 only to a particular store but to the variety of the many stores. Pasterv. City of St. Louis, 706 S.W.2d 520 (Mo.App. 1986). As consequence of its nature, retailers are particularly dependent on the economic viability of the Civic Center. The plaintiff claims it had a reasonable expectation that Aetna would maintain the viability of the Civic Center by reasonable efforts to promote it and to ensure its high occupancy rate. The failure of Aetna to do so, plaintiff asserts constitutes a breach of the covenant of good faith and fair dealing.
In support of this contention plaintiff cites a number of cases. InPequot Spring Water Co. v. Brunelle, 46 Conn. App. 187, 195 (1997) the court held that a lease containing a provision that rent would be based on a percentage of sales created an implied covenant that the tenant would continue to operate and generate sales for the duration of the lease. The court said, "The implied covenant is necessary to a rational understanding of this lease." Daitch Crystal Dairies v. Neisloss,190 N.Y.2d 237 (AD Second Dept., 1959), aff'd.8 N.Y.2d 723 (1960), held that a lease giving the tenant exclusive right to operate a supermarket on the premises and providing for rents based on percentage of sales implied that the landlord could not construct another supermarket adjacent to the demised premises. Likewise, Carter v. Adler, 291 P.2d 111, 117 (Cal., 1955), held that where a lease provided for a tenant paying a percentage rent and granting to the tenant exclusive right to sell certain products, the landlord violated the covenant of good faith and fair dealing by opening a supermarket on an adjoining parcel so as to defeat the rights of the tenant under the lease.
However, the above cases all apply the covenant of good faith and fair dealing as a means of construing a specific provision of a contract.
That construction is consistent with comment A of Section 205 of the Restatement of Contracts to the effect that, "good faith in performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the parties." (underlining added)
In McCorp v. Deprofio, CV 9008-3925, Jud Dist of New Haven, (Vertefeuille, J., December 5, 1991), 7 CSCR 267, the defendant tenant counterclaimed that the plaintiff landlord breached the covenant of good faith and fair dealing by entering into a lease with an allegedly formidable competitor of the defendant, which could forseeably put the defendant out of business. Holding that since the parties have not agreed to a non-competition provision, there was no violation of the covenant, the court said, "In this case, the lease between the parties is entirely silent as to the landlord's ability to rent other space in the shopping center to tenants of the landlord's choosing. There is no contract CT Page 10521 provision to which the good faith and fair dealing obligation can be applied."
In the instant case there is a provision in the lease between the parties relating to Aetna's obligation to promote the Civic Center. That provision provides that Aetna will contribute at least twenty-five percent of what the tenants paid to a Civic Center marketing fund. In fact, over the years of the lease Aetna contributed many many more times the amount it was obligated to contribute to that fund.[2] That provision of the lease established the duty of Aetna with respect to promoting the Civic Center.
Certainly the court cannot generalize from the essential nature of the Civic Center an obligation in Aetna to maintain the economic viability of the Civic Center. A number of cases have held that the implied covenant of good faith and fair dealing does not impose upon the owner of a shopping mall an obligation to maintain its character as a vibrant economic enterprise. In Village Line Corp. v. The Children's Store, CVNH91O1-2655, Jud Dist of New Haven at New Haven, Housing Session, (Riddle, J., October 7, 1993), a tenant in a shopping mall, being sued for unpaid rent, alleged in a counterclaim that "through mismanagement in response to market condition [the landlord] permitted the occupancy rate of the space dedicated to retail stores to fall approximately fifty to sixty percent, with the corresponding vacancy rate of approximately forty or fifty percent" and this impacted upon the gross revenues of the defendant store. The court granted a motion to strike this counterclaim on the grounds that "The defendants have not cited to any provisions in the lease agreement which would indicate that such a duty was consistent with `agreed common purpose' or within `justified expectations' of the parties. Furthermore, defendants have cited no Connecticut authority in support of their contentions that the plaintiff's conduct amounted to a breach of duty."
In Michigan Sporting Goods Distributors, Inc., Kenrick Associates, Inc., L.P., 927 S.W.2d 570 (Mo. Court of Appeals, E.D. 5, 1996), the plaintiff tenant sought a declaratory judgment that the landlord had breached a shopping center lease by failing to operate the property as a retail shopping center. The court dismissed the complaint as not stating a cause of action, holding, "However the lease does not unambiguously place a duty on defendant to ensure the existence of such a shopping center. Nor is there any expressed or implied requirement that a certain level of tenancy or specific number or percentage of retail stores be maintained in the shopping center. Furthermore, there is no ambiguous language that is reasonably susceptible to a construction which would place such a duty on defendant[3]." Id. p. 573. CT Page 10522
In Papa Gino's, Inc. v. Assembly Square Mall, LLC, 1998 W.L. 118, 1159 (Mass.Super. Middlesex, SS, October 23, 1998), plaintiff tenant moved for a real estate attachment on the grounds that the defendant owner owed a duty of continuous operation of a shopping mall such that it should have found a replacement anchor tenant for the one that left and should have found new tenants for other smaller departing tenants. The court denied the application for attachment on the grounds that the plaintiff was not likely to avail on the merits of the claim, holding, "Papa Gino's lease contained no explicit language to support a claim that both parties intended that the Mall owner maintain the general economic viability of the Mall." The court went on to say that the language of the lease would not "give rise to an implied understanding that the Mall owners had a duty to provide for the continued operation of the Mall as it was when the parties entered into the lease."
Courts have construed the duty of good faith and fair dealing "as a protection device to approximate terms not actually contained in a contract, but those that would have been included `expressly if at the time of making the contract [the parties] had had complete knowledge of the future, and the cost of negotiating and adding provisions to the contract had been zero.'" Market Street Associates, Ltd., Partnership v.Frey, 21 F. 3rd 782, 786 (7th Cir. 1994). This expansive conception of the covenant comes close to allowing courts to rewrite the contract of the parties. Whether or not it accurately state the law, in the instant case, even if the parties did contemplate the future vagaries of the economic situation in downtown Hartford, the likely provision the parties would have agreed to would be to relieve the plaintiff of obligations under its lease if occupancy at the Civic Center fell below a certain percentage of retail space or an anchor tenant left. These are the provisions contained in other leases at the Civic Center.
Moreover, if the reasonable expectations of the plaintiff was to be considered, those of Aetna should also. The Civic Center was an economic venture in which Aetna was engaged in not only as a good citizen of Hartford but also to make a profit. Clearly, its reasonable expectations did not include continuing to promote the Civic Center when it was losing hundreds of thousands of dollars every year. Nor did it assume an obligation as a guarantor of the plaintiff's prosperity.
Moreover, our courts have recognized that "a party to a contract is entitled to take reasonable positions to protect its interests." Elliottv. Staron, 46 Conn. Sup. 38, 48 (1999).
Here Aetna acted reasonably to cut its losses arising from the operation of the Civic Center in light of the departure of the Whalers, the expansion of shopping malls in the suburbs, and the deteriorating CT Page 10523 economic situation in downtown Hartford.
Section 205 of the Restatement, comment (a) notes that good faith "excludes a variety of types of conduct characterized as involving `bad faith' because they violate community standards of decency, fairness or reasonableness." The courts recognize that bad faith means more than mere negligence. "It involves a dishonest purpose." Habetz v. Condon,224 Conn. 231, 237 (1992). Bad faith in general implies "`a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive. . . . [it] . . . implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with a furtive design or ill will.'" Buckman v. People Express, Inc., 205 Conn. 166, 171
(1998).
In the instant case, Aetna pursued its own self interest in limiting its losses in the operation of the Civic Center, but it did not do so because of a dishonest purpose, a furtive design or ill will toward the plaintiff.
The plaintiff also contends that Aetna breached the implied covenant of good faith and fair dealing by rejecting the plaintiff's request to renew its lease in 2000. Plaintiff bases this argument on the fact that Aetna rejected plaintiff's option to renew its lease because the plaintiff had not realized annual sales of $262,500 a year and that this was an unreasonable basis for rejecting it in light of the fact that Aetna had so failed to promote the Civic Center as to prevent the plaintiff from realizing that volume of sales. However, the plaintiff ignores the fact that when it sought to exercise the option, it had been in default in its rent for several months and this also was one of the grounds upon which Aetna rejected plaintiff's exercise of the option. Certainly the failure to pay rent was a justifiable basis for Aetna refusing to extend plaintiff's lease and not a violation of the covenant of good faith and fair dealing.
Thus, the court holds that the plaintiff has failed to prove by a fair preponderance of the evidence that Aetna violated the covenant of good faith and fair dealing.
 II. Negligent Misrepresentation
In its count for negligent misrepresentation, the plaintiff claims that Aetna undertook a plan to enter into short term or flexible term leases with its tenants and to reduce its promotion of the Civic Center, did not inform the plaintiff of the plan, and, as a consequence, the plaintiff CT Page 10524 renewed its 1995 lease and continued to invest in its business to its economic ruin
The cause of action of negligent misrepresentation lies when: (1) defendant had a duty to use reasonable care in giving information; (2) defendant supplied false information; (3) upon which the plaintiff relied; (4) to its damages. 37 A.L.R.2d Fraud and Deceit, Section 128. The two essential elements are a duty on the part of the defendant to disclose and reliance on the part of the plaintiff.
The duty to disclose correct information arises from a closer degree of trust and reliance than in the ordinary business relationship. "Accordingly, a claim for negligent misrepresentation can only stand when there is a special relationship of trust and confidence which creates a duty for one party to impart correct information to another." Id. at Section 129. When the claim is failure to disclose information, the elements of the cause of action are the same. As stated in Ceferatti v.Boisvert, 137 Conn. 280, 283 (1950), "To constitute fraud by non-disclosure or suppression there must be a failure to disclose known facts and, as well, a request or an occasion or circumstances which impose a duty to speak." Also, in Franchey v. Hannes, 152, 372, 378 (1965) our Supreme Court has said: ". . . mere silence is not actionable in a transaction in which the parties deal at arms length unless the circumstances or the existence of a confidential relationship give rise to a duty to speak."
Under the circumstances of this case the plaintiff and Aetna were not fiduciaries nor were they involved in any other relationship that would require Aetna to disclose to the plaintiff information about its internal decision to sell the Civic Center or to disclose its plans to promote the Civic Center.
Moreover, the plaintiff has failed to prove that it relied upon Aetna's plan to cease actively promoting the Civic Center. In 1994 the plaintiff's principal, Joseph Melendi testified that he knew that the Civic Center's occupancy had decreased and that Aetna's agent was no longer promoting or advertising the center. Nevertheless, the plaintiff renewed its lease in 1995 because the cigar business was at that time experiencing an unprecedented boom in the country. Moreover, even after 1997, when Aetna had decided to sell the Civic Center and had notified the tenants of that intention, plaintiff applied to renew its lease in the year 2000. Thus, the plaintiff had actual knowledge of the information that Aetna allegedly withheld and nevertheless sought to continue its tenancy in the Civic Center.
The court concludes that the plaintiff has failed to prove its cause of CT Page 10525 action of negligent misrepresentation because it has failed to establish that Aetna had a duty to disclose information that it allegedly withheld from plaintiff and that the plaintiff relied upon Aetna's alleged omission.
 III. Violation of CUTPA
The Connecticut Unfair Trade Practices Act provides:
 "No person shall engage in unfair methods of competition in an unfair or deception acts or practice in the conduct of any trade or business." General Statutes § 42-110b (a).
In construing the statute, our courts have adopted the following criteria for determining whether a practice is unfair:
 (1) Whether the practice, without necessarily having been considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other business men]
Conway v. Prestia, 191 Conn. 484, 492-93 (1983).
As stated in Normand Joseph Enterprises, Inc. v. Connecticut NationalBank, 230 Conn. 486, 522 (1994). "All three criteria need not be satisfied to support a finding of unfairness. The practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three."
Here, plaintiff contends that Aetna's conduct was unfair, immoral and unscrupulous because Aetna terminated its active leasing efforts in 1996 and 1997, refused to enter into new leases unless they were of unreasonably short duration or included flexible termination options in favor of Aetna; eviscerated its advertising and promotional efforts at the Civic Center, and kept the Civic Center open to minimize its operating losses and avoid paying millions of dollars in capital expenses and in potential retail tenant lease buyouts. As indicated above, the plaintiff has failed to prove its counts of violation of the covenant of good faith and fair dealing, or negligent misrepresentation, and thus has failed to prove Aetna violated public policy established by statute or CT Page 10526 common law.
At the most, plaintiff has shown that Aetna in an attempt to extricate itself from an unprofitable business venture, reduced its promotion of the Civic Center and changed its leasing policies in order to facilitate a sale of the Civic Center. That hardly constitutes unfair, immoral or unscrupulous conduct. In Boulevard Associates v. Sovereign Hotels, Inc.,72 F.3d 1029, 1039 (2nd Cir. 1995) the tenant breached a lease for the sole purpose of saving money. The Second Circuit found no CUTPA violation. It held that ". . . to back out of a business venture that was losing money. . . . offends no particular public policy." The court further noted, "A rule to the contrary — that a company violates CUTPA whenever it breaks an unprofitable deal — would convert every contract dispute into a CUTPA violation. We cannot assume that the Connecticut legislature, in enacting CUTPA, intended such an extraordinary alteration of the common law."
Thus, the court concludes the plaintiff has failed to establish that Aetna engaged in any acts that were unlawful, that offended public policy as established by statutes or common law, or were immoral, unethical, oppressive, or unscrupulous. As a consequence, the plaintiff has failed to establish its count of a violation of CUTPA.
Based on the foregoing, judgment may enter in favor of the defendant.
 ___________________ Robert Satter Judge Trial Referee